In Special Term—May 1855.

SPENCER, J. presiding.

### WILLIAM S. WRIGHT & Co. *vs.* ELLIS & MORTON.

C. & F., insolvent partners, obtained a draft from E. & M., bankers, for $2500, which they gave their check on R. Same day they sent the draft by mail boat to W. & Co., one of their creditors at New Orleans. The check was presented for payment to R. and dishonored for want of funds of C. & F. to meet it. E. & M. notified C. & F. of the dishonor and demanded the return of their draft. C. & F. gave them an order for the same on W. & Co. E. & M. telegraphed the house on whom the draft was drawn not to pay it, and notified W. & Co. before its arrival at New Orleans, that it was obtained without consideration, and that it would not be paid. After the draft's arrival at New Orleans, defendants demanded it of W. &. Co. This was refused; it. was presented for payment, dishonored, and protested, of all which the proper notice was given to E. & M. Suit was brought upon the draft by W. & Co. against E. & M. Held:

That as W. & Co. had notice of the fraud used in obtaining the draft, before they gave credit in account with C. & F., they could not recover.

That the delivery to the mail, to be transmitted, was not such a delivery as to vest the property in the draft in W. & Co.

That no acceptance of the same was to be inferred from such delivery.

· That though the law will presume a delivery and acceptance in certain cases, in favor of natural justice, when goods are delivered to a carrier, &c., yet it never presumes *against* natural justice and equity.

SPENCER, J.

This is an action brought by the plaintiffs, to recover from the defendants the amount alleged to be due on a bill of exchange, drawn by the defendants upon their correspondents and agents, at New Orleans, in favor of Cham-

plin & French, for the sum of $2,500, and by Champlin & French endorsed to the plaintiffs.

The case has been submitted to the Court upon the following agreed facts.

On the 16th February, 1853, Champlin & French, a firm doing business in Cincinnati, then in fact insolvent, being indebted to the plaintiffs, a firm doing a commission business in New Orleans, in the sum of $2,500 and upwards, purchased from the defendants, the draft or check sued upon, giving in payment therefor their own check upon their bankers, S. S. Rowe & Co., of Cincinnati, having then but a *small* balance in bank, wholly insufficient to cover the check. On the same day they enclosed the draft in a letter directed to the plaintiffs at New Orleans, and sent it upon a steamboat carrying the mail, which left on that day for New Orleans. In the afternoon or evening of the same day, William S. Wright, one of the plaintiffs, residing in Cincinnati, whose business it was to make advances upon consignments shipped to their house in New Orleans, called upon Champlin & French, and inquired if they had remitted, to which they replied they had, (not stating the *mode* of remittance.) Due presentment of the check for payment being made by the defendants, it was dishonored, for the reason above stated. And on the day following, the defendants called upon Champlin & French, and demanded a return of their draft. And thereupon Champlin & French gave to defendants a written order upon the plaintiffs, to deliver up the draft to defendants, as having been obtained without consideration; and on the same day defendants wrote and telegraphed to their agents in New Orleans, upon whom the draft was drawn, not to pay it, and requesting them to notify the

plaintiffs and the public of the circumstances of the case. This letter and dispatch were received by the agents at New Orleans, who in compliance therewith notified the plaintiffs of the circumstances under which the draft had been obtained by Champlin & French, and that it would not be paid. This notice was given to the plaintiffs in New Orleans before the draft was received there by them, and before they were otherwise apprized that it had been sent, except the information given to Wright, as above stated. A similar notice by telegraph had also been received by the plaintiffs, from the defendants, on the 21st February 1853. After the draft was received by the plaintiffs, on the 26th February, a demand was made upon them for it, in behalf of the defendants; but they refused to give it up; and the same was thereupon regularly presented for payment, payment refused, draft protested, and due notice thereof given to defendants. It was also agreed, that on the 4th day of February, 1853, Champlin & French had made a remittance of the same amount to the plaintiffs.

Had this action been brought by Champlin & French, it is very certain there could be *no recovery*. The facts stated show a clear *fraud* on their part, in obtaining this draft, such as precluded them from acquiring any right therein. Unless, therefore, the plaintiffs, who derive their title from them, can be protected upon the plea of being innocent purchasers for value, without notice, they cannot occupy any better position than could Champlin & French. To constitute a purchase for *value*, it is not necessary that money, or other valuable thing, should have been advanced or given by the *purchaser*. We have held it sufficient that he has given *credit*, in respect of the thing

purchased, at the time when it is received; as, by the extinguishment of a *precedent* debt, or giving further time of payment thereon. But in all such cases the credit must be actually given, at the time when the property or other thing is *delivered*, and before the receiving party has any notice of the want of title in the other to make the delivery. The question then arises, when was credit given by the plaintiffs, if at any time, to this paper? It is very clear, that it was not given by the house at New Orleans, until *after* it had been notified of the defendants' rights. It is equally clear, that it was not intended nor expected by Champlin & French, that any credit should be given to them *in payment*, or on account, until the draft should have been received by the plaintiffs in New Orleans. That was the point of time from which the whole transaction as a payment on one side, and a release on the other, should take effect. And it is equally apparent, that no such credit was given, or intended to be given, to the transaction by the plaintiffs in Cincinnati; but the matter was referred to the discretion of the house in *New Orleans*, where payments in their usual course of business were expected to be made. This is manifest from the consideration, that the check was not handed over in the *first instance* to the plaintiffs here, instead of being sent to New Orleans, for *credit*; that the plaintiffs here were not even advised of the *nature* of the remittance, nor, so far as appears, of its *amount*. That the same was made wholly at the *risk* of Champlin & French. And had it *miscarried*, or the bill proved worthless, the loss would have fallen upon *them*, and not upon the plaintiffs.

It is claimed, however, on the part of the plaintiffs, that upon the mailing of the letter containing this draft, di-

rected to them at New Orleans, the *delivery* of the bill to them was complete in law, vesting them with the title to it, and that their *acceptance* of, and consent to receive the same in payment, was not necessary for that purpose; but such assent, (as it was for their benefit,) will be *presumed in law*, until their *dissent* has been made known.

With the exception of the case from *Strange* 165, the only class of cases, to which our attention has been called, in support of this proposition, are those, where goods have been shipped on board of a vessel, by the owner, or by his orders, consigned to his creditor, in payment, or on account, and a bill of lading has been signed by the captain of the vessel, and *delivered* by the owner or his agent to the captain, to be handed over to the consignee, or otherwise been sent to the consignee, and where the shipment was in pursuance of some previous advice. Such was the character of Ward *vs.* Roach et al., 1 *Yates* 177, 2 *Dall.* 180, *S. C.*; Summeril *vs.* Elder, 1 *Binn.* 106; Clark *vs.* Mauran et al., 5 *Paige* 373. In all which stress was laid upon the fact, that a *bill of lading* had been signed for the goods, which it was said of itself passed the *title* to the consignee; and upon the further fact, that upon *equitable considerations*, the title would be regarded as vesting by the delivery to the carrier.

On the other hand, in the case of Walter et al. *vs.* Ross, 2 *Wash. C. C.* 283, where goods had been sent on board a vessel, by a debtor, consigned to his creditor, and a bill of lading actually signed therefor, by the captain of the vessel, of which he retained his *own* copy, but the *consignor* had not put into his hands a duplicate to be handed to the consignee, nor in any other manner parted with it; nor advised the consignee, by previous letters, of his in-

tention to remit in this particular mode, although he had written him in general terms that he would remit; it was held, that the title to the goods had not passed by the delivery to the captain, and the signing of the bills of lading; and that the consignor had a right to withdraw the *original shipment*, and give the goods *another destination.*

The strongest case in favor of the plaintiffs is that of Atkin *vs.* Barwick, 1 *Strange* 165. That was an action brought by the assignee of a bankrupt, to recover the value of some silks, alleged to have belonged to the bankrupt. On the 7th of April, the defendants, doing business in London, sent to the bankrupts at Penryn, in Cornwall, by *their order,* the goods in question, and gave them credit on their books. On the 8th of May following, the bankrupts, (without the knowledge of the defendants,) sent the same to Mr. Penhallow, also in Penryn, for the use of the defendants. On the 4th of June the act of bankruptcy was committed; and on the 6th the bankrupts wrote a letter to defendants, "stating that their affairs "were in a declining condition; that it was not reasonable "the last parcel of goods should go to satisfy their other "creditors; and therefore *they had not entered* them in "their books, but left them with *Penhallow,* who had or- "ders to deliver them to the defendants." After the commission of bankruptcy issued, and the effects were assigned to the plaintiff, this letter was received by the defendants; being the *first notice* they had of the delivery to *Penhallow;* and as soon as possible thereafter, they signified their consent to take the goods again. The Court held, that "under the special circumstances," the *title* passed to the defendant, by the delivery to Penhallow, the *precedent* debt being a sufficient consideration for the de-

livery, and as the delivery was for the benefit of the defendants, their assent to it, in satisfaction, would be *presumed*, until their dissent was made known. If this had been the *only ground* of the decision, the case is hardly reconcileable with that of Hague *vs.* Rolleston, 4 *Burr.* 2174. Scott being largely indebted to Rolleston, on the 26th of March deposited certain bags of cochineal, with Stout, for the defendant, having told Stout the day before, that they were for the defendant; and they were so *booked* at the warehouse. On the day following, Scott committed an act of bankruptcy, and the next day, being the 28th, he wrote to the defendant a letter containing a bill of parcels, and sale of the cochineal, dated on the 23d, for a sum *less* than the amount of the defendant's debt, (although there had *in fact* been no purchase,) and stating he had deposited the cochineal with Stout, in the defendant's name, and for his use. This letter was received on the 30th of March, and on the same day the defendant received the cochineal from Stout. But though the goods were sent to the *warehouse before* the bankruptcy, the defendant did not then know they were there, and did not declare his acceptance of them until after that time. The Court held, that no *title* could have passed to the defendant, until the *acceptance by him.* The only difference *in fact* between this case and that from East is, that in this the conveyance was in *form* a *bill of sale*, as though a *purchase* had been made; though the *obvious intent* was to have the cochineal applied as *payment, pro tanto,* of the debt due the defendant; whilst in the case from East, there was no *bill of sale* in form, but a delivery for the purpose of annulling the original purchase. There is no doubt that the case from East was decided upon its own

*intrinsic equity,* and that the *equity* of the doctrine of stoppage in transitu, not then fully established at law, was applied to that case. It does not appear from the statement in that case, that the silks ever *in fact* came into possession of the bankrupts; if so, they were probably sent to Penhallow, without being opened. The language of the case is, that the bankrupts had not yet "entered the goods in their books to the credit of the defendants." And as the purchaser ordering the goods *had become* embarrassed and unable to pay for them when they were received, and *credit* had not been given for them, there was an exceedingly strong *equity and natural justice,* that they should be *returned* to the person from whom they were obtained, and who had received *no consideration* for them.

Such was the view of that case taken by Lord Mansfield in Alderson *vs.* Temple, 4 *Burr.* 2237. There it appears, that on the 10th *October* the bankrupts had *exchanged* notes with *Bryer & Everard,* for £600, payable in *two months* after date. On the 7th of November they sent the note given them by Bryer & Everard, (*this one being unpaid,*) enclosed in a letter to the defendant, to whom they were indebted in a *large* amount, whether as *payment* to that extent, or whether it was to be received at the *risk* of the defendant, did not appear. This letter was not received by the defendant, until the 10th; between which time and that of its being sent, the bankruptcy was committed. It *further appeared,* that the note was sent to the defendant in *contemplation of insolvency.* It was held that the *indorsement* of the note was *fraudulent,* on the part of the bankrupts, as against *Bryer & Everard,* who would thus be deprived of their just *set-off,* and therefore void; and that the act of transfer was not

70

*complete* as between the parties, until *acceptance* and *assent* by the defendant.

The other Term Judges put the case expressly upon the ground, "that assent is necessary to complete every contract; and as the defendant had his election until the 10th of November, and the act of bankruptcy was committed on the 8th, the contract was *incomplete.*" The remarks of Lord Mansfield are so apposite to the present case, that I cannot avoid transcribing a portion entire. Page 2239, he says, "I choose to put the case upon the ground of *fraud*, because the most desirable object in all *judicial* determinations, especially in *mercantile* ones, (which ought to be determined upon *natural justice*, and not upon the niceties of law,) is to do *substantial justice.* And therefore I will avoid laying the stress, that might properly be laid upon the *assent* being necessary to *complete* the contract, or the *want of delivery;* the *solid* ground of which is, that a contract shall be *presumed* complete upon any distinction, when the *justice* of the case requires it, though there is no *actual* delivery. And it is settled, that if a man send bills of exchange, or consign a cargo, and the person to whom he sends them has *paid the value before;* though he did not know of the sending them at that time, the sending of them to the *carrier* will be sufficient to prevent the *assignees* from taking these goods back, in case of an intervening act of bankruptcy. But if goods, or bills of exchange, are sent, and the consideration has *not* been received, the *Court of Chancery* always *interposes;* and there are numbers of adjudged cases of that kind in chancery," (alluding to the equitable doctrine of *stoppage* in transitu, not then established at law.) In the case in Strange there is no doubt, but the honesty of the case inclined the

Court to the judgment they gave; *the reason* given turns upon a *subtlety*. The Court of *Chancery* in that case would have interposed and said, "The assignees should not have "the goods without paying the price. I think the deter- "mination was right, and there was an actual delivery to "a person, who became a *trustee:* but a *post boy* is not a "trustee. I think the case was well supported upon other "grounds than those mentioned in the book."

And so, in all the other cases, in which it has been held, that the title passed upon the *delivery* to the *carrier;* and that *assent* or acceptance will be presumed, there was strong *intrinsic equity* in holding the transfer complete.

In the first place, (which comprises a *marked feature* in such case, and upon which this *justice* rests,) the person sending the goods was their *real owner*, and had the right to make the disposition contemplated. In the second, the questions all arise between *different creditors*, when the equity of the transaction was in favor of the *particular* creditor to whom the goods or property were sent, and the assignee of a *bankrupt*, or *attaching creditors*, who had *no* such equity. And therefore the Courts applied every presumption of law to sustain justice and right. But such presumptions are never made *against* the justice and equity of the case.

How then stands the equity in the present case? Ellis & Morton have received *no consideration* from any one for this bill, but were defrauded of it by Champlin & French. It was equally fraudulent in Champlin & French to send the bill to the plaintiffs. The plaintiffs have in fact parted with *nothing valuable*, nor, as appears, been in *any wise jeopardized* by the receiving of the bill. They never gave any *actual* assent to its acceptance before it was received,

and *no credit* in payment or on account, until after notice of the defendants' rights, and the *perpetrated fraud;* nor was it put into the hands of any trustee, in whom *title* was vested, for their use. The case being such, that an *express acceptance* at the time of delivery to the carrier would have been *fraudulent,* had the circumstances been known to the plaintiffs, the law will not *imply* that which would have been a wrong on their part. And the *express acceptance* by them *afterwards,* and when the fraud was known, will not be held, to relate back to the time of such *delivery,* so as to make good their title; because the doctrine of relation is founded upon equity, and is applied only in support of justice, not to defeat it.

I put out of view, as of no serious consequence, the fact, that *after* this letter had been sent, enclosing the bill, Champlin & French communicated to one of the plaintiffs the fact, that a remittance had been made of *some kind* to the plaintiffs' house in New Orleans; because that circumstance alone would not have put the remittance at *the risk* of the plaintiffs; and does not furnish sufficient evidence, that any additional credit was given to Champlin & French, on account thereof, which would not otherwise have been given. And I do not think that the real equity of the case requires me to strain a point in favor of the plaintiffs.

Judgment will therefore be entered up in the case for the defendants.

MINER & OLIVER for Plaintiffs.

WORTHINGTON & MATTHEWS for Defendants.